## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| J.P. MORGAN SECURITIES LLC, | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DALE L. SELF, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT
### (INJUNCTIVE RELIEF SOUGHT)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendant Dale L. Self ("Self" or "Defendant"):

### Preliminary Statement

1.    This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

2.    This dispute arises out of Defendant's departure from JPMorgan on January 6, 2023, and the immediate commencement of his affiliation with Maia Wealth Management, LLC ("Maia"). At the time of his resignation, Defendant was a Private Client Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan. Defendant now works for Maia in Indianapolis, Indiana. While at

---

[1]    JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes, a copy of which is annexed as Exhibit A to the Declaration of Leonard Weintraub.

JPMorgan, Defendant worked with a JPMorgan Private Client Investment Associate, Lane Stamper ("Stamper"), who also resigned with Self and now works with him at Maia.

3.      In connection with his employment, Defendant entered into at least two employment agreements that contain restrictive covenants prohibiting him from soliciting JPMorgan's clients for a one-year period after the termination of his employment, and prohibiting him from retaining, using or disclosing JPMorgan's confidential and proprietary business and client information and trade secrets ("JPMorgan's Confidential Information") after his departure.

4.      JPMorgan has learned that after resigning and joining Maia, Defendant has been aggressively soliciting JPMorgan clients to move their accounts from JPMorgan to Maia.  More than a dozen JPMorgan clients have informed JPMorgan that Defendant's calls to them (many on their cell phones) have not been simply to announce his change of employment, but rather, to request meetings with the clients or to induce them to leave JPMorgan and do business with him at Maia.  Additionally, several JPMorgan clients have informed JPMorgan that Defendant began soliciting them to move their business to him at Maia even before he resigned.

5.      Moreover, at least 35 JPMorgan clients informed JPMorgan that after Self resigned they received emails from Maia that provided links (through an application called DocuSign) to account applications and account transfer paperwork (the "DocuSign Emails") – many of whom had not spoken to Self after he resigned before they received such emails.

6.      Several JPMorgan clients provided samples of the DocuSign Emails they received.  One DocuSign Email from Maia to a JPMorgan client stated: "We are super excited to have [Self] join us **and for you to join us as well!**  We have sent you some forms via docusign

*that we are needing completed in order to transfer over your account*." (Emphasis added.) The client informed JPMorgan that Self called her twice shortly after he resigned (on Saturday and Sunday, January 7 and 8, 2023) and told her, in sum and substance, that "nobody at Chase would be able to help her like he can and that she won't get taken care of if she doesn't move her accounts." The client reported that she had informed Self that she did *not* want to transfer her accounts to him *before* she received such email.

7.    Another JPMorgan client informed JPMorgan that he received two emails from Self after he resigned, even though he had not spoken with Self after his resignation. The client received the first DocuSign Email on January 6, 2023 (the same day Self resigned) that stated: *"Please electronically sign the TD Ameritrade Institutional[2] forms to establish your investment accounts at TD Ameritrade."* Through the DocuSign link attached to the first email, the client's TD Ameritrade account application was filled out with all of his personal information, including his social security number, date of birth, account numbers and his contact information. That same day, the client received a second email from Maia, stating: "We are so excited to have Dale [Self] and Lane [Stamper] join us as part of the Maia Wealth Family. . . . I have sent you your investment paperwork via DocuSign. When you have a moment, please review and e-sign." The client informed JPMorgan that at the time he received such emails, he had not spoken to Self after he resigned (before he received such emails), had not provided his information to Self, did not authorize him to use it, and had not requested such paperwork.

8.    Several other clients also reported receiving DocuSign Emails as early as January 6, 2023, *the day Defendant resigned from JPMorgan.*

---

[2]    According to Maia's most recent Form ADV, Maia generally recommends that its clients establish their accounts with TD Ameritrade Institutional, which is a direct competitor of JPMorgan.

9.     The DocuSign Emails provided to JPMorgan show that the clients' confidential information was already completely filled out.  Each of the clients who provided the DocuSign Emails to JPMorgan stated that they had not provided their information to Defendant, had not authorized Defendant to use it, and had not requested the paperwork.

10.     Numerous JPMorgan clients reported that when they clicked on the link in the DocuSign Emails they were provided access to the paperwork, which ***already had been filled out with all of their information***, including their social security numbers, dates of birth, account numbers and their contact information.  Most of the clients who reported receiving DocuSign Emails affirmatively stated that they (i) had not requested or authorized Defendant to use their information to fill in the forms or send them to the clients, or (ii) were completely unaware that Defendant had resigned.

11.     After receiving DocuSign Emails, several clients expressed concern to JPMorgan about the status of accounts, and whether their private information was not being properly protected or was being used without their consent or authorization.  At least one client demanded to know what JPMorgan was planning to do to rectify the situation and make sure his personal information was being protected.

12.     One client reported that she received at least four emails from Defendant after he departed from JPMorgan, as well as a UPS package containing a paper version of the same pre-filled account application and account transfer documents that were made available through the DocuSign Emails.  The client stated that she never requested or authorized Defendant to retain or use her information or send her messages soliciting her business.  The client further stated she was scared to answer any calls and had begun screening her calls,

because she was worried that it would be Defendant or a Maia representative, and she did not want to speak to them.

13. More than a dozen JPMorgan clients reported receiving telephone calls from Defendant after Defendant departed from JPMorgan, during which Defendant sought to convince the clients to transfer their accounts from JPMorgan to him at Maia. Many of the calls were placed to the clients' cell phones. At least five of these clients reported that they also received DocuSign Emails.

14. One client reported that in addition to receiving the DocuSign Email Defendant called her twice over a weekend, including at 7:30 on a Sunday evening, stating that "Chase would not pay any attention to" the client and would put the client's "account on a shelf and ignore" her. Even though the client informed Defendant that she did not want to transfer her accounts away from JPMorgan, Defendant nonetheless stated he would call again later in the week, "after she has time to consider."

15. Another client reported to JPMorgan that when Defendant called him to try to convince him to move his account to Maia he told the client that Maia would be a "good fit" for the client and Maia's fees would be lower than JPMorgan's.

16. Another JPMorgan client informed JPMorgan that Self told the client that Maia was superior to JPMorgan and had "better systems" and a "full legal team."

17. At least two other JPMorgan clients stated that Self attempted to convince them to move their accounts to Maia by telling them there would be various "benefits" they would receive if they moved their accounts. One of the clients stated that Defendant assured him it would be "an easy transition."

18.     At least ten other JPMorgan clients reported that they were told by Defendant that he would be leaving JPMorgan in advance of his resignation (some as many as three months before he left).  At least three of these clients reported that Defendant, while still working at JPMorgan, requested that they move their accounts when he left.  Another client told JPMorgan that Self spoke about "how bad things were" at JPMorgan.  Two other JPMorgan clients said Self told them that he "expected" them to move their accounts to him.  At least three other JPMorgan clients reported being asked by Self not to say anything about his imminent departure.

19.     Another client informed JPMorgan that while he had no interest in moving his accounts away from JPMorgan, he did ask Defendant if he could answer questions about his account, and Defendant said he could answer questions because he had a "snapshot" of his account.

20.     Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 38 JPMorgan client households formerly serviced by him at JPMorgan, with assets totaling more than $25 million, have transferred their accounts to Defendant at Maia.

21.     At the time he left JPMorgan, Defendant serviced approximately 260 JPMorgan clients/households, representing approximately $105 million in total assets under management.  The vast majority (*i.e.*, more than 85%) of the clients serviced by Defendant at JPMorgan were clients of JPMorgan or its predecessor entities prior to Defendant working for JPMorgan, and nearly all of the remaining clients were assigned to Defendant or were developed by JPMorgan while Defendant worked at JPMorgan.  Defendant now seeks to improperly induce such JPMorgan clients to follow him to Maia.

22.    In addition to improperly soliciting JPMorgan clients, Defendant improperly took with him to Maia JPMorgan's confidential client information, including contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, and highly confidential personal information such as social security numbers, dates of birth and account numbers. Without this confidential client information, Defendant would have been unable to immediately commence calling and soliciting JPMorgan clients upon his resignation and, further, would have been unable to send them the pre-filled out TD Ameritrade account applications.

23.    Defendant's conduct constitutes a breach of his employment agreements (which contain non-solicitation provisions) and a violation of his common-law and statutory obligations to JPMorgan.

24.    To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claim for permanent injunctive relief against Defendant in a related arbitration that JPMorgan is in the process of commencing.

**Jurisdiction and Venue**

25.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 based on JPMorgan asserting claims arising under the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.  The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 because those claims are closely related to JPMorgan's federal claim and form part of the same case and controversy.

26.    The Court also independently has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

27.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Indianapolis, Indiana.

## The Parties

28.    Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.  Defendant maintains securities licenses through FINRA.

29.    JPMorgan provides traditional banking, investment, and trust and estates services in the Indianapolis, Indiana area through its Chase Wealth Management branch offices. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

30.    Defendant is an individual who at all times relevant herein was employed and/or conducted business in Indianapolis, Indiana and is and was a citizen of Indiana.  On information and belief, Defendant now works for Maia in Indianapolis, Indiana.

31.    In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or

Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims and controversies arising between himself and JPMorgan.

**Factual Allegations**

32.     Defendant commenced employment with JPMorgan or its predecessors in December 2009, when he joined Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer and an affiliate of JPMorgan.[3]  In 2012, he entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated July 31, 2012 (the "2012 Non-Solicitation Agreement").  Self held the position of Financial Advisor, with the title, "Vice President."  Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

33.     The 2012 Non-Solicitation Agreement contains a provision prohibiting Defendant from soliciting the firm's clients for a one-year period after the termination of his employment.  The 2012 Non-Solicitation Agreement also contains provisions requiring him to (i) maintain the confidentiality of JPMorgan's Confidential Information at all times during and after his employment, (ii) not disclose or communicate JPMorgan's Confidential Information to any third-party unless permitted under JPMorgan policy, and (iii) not use JPMorgan's Confidential Information for his own benefit or for the benefit of any third-party.

34.     In July 2013, in connection with his promotion to the position of Private Client Advisor, Defendant entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2013 Non-Solicitation Agreement") with JPMorgan.  The 2013 Non-Solicitation Agreement also contains a provision prohibiting

---

[3]     Defendant briefly left Chase Investment in August 2011, and rejoined Chase Investment in July 2012.

Defendant from soliciting the firm's clients for a one-year period after the termination of his employment, as well as similar confidentiality provisions.

35.    At the time of his resignation, Defendant was a Private Client Advisor for Chase Wealth Management, with the title, "Vice President – Investments," working out of a JPMorgan Chase bank branch.  As a Private Client Advisor, JPMorgan Chase referred its bank clients to Defendant, expressly entrusting him to service JPMorgan's clients and build JPMorgan's relationship with these clients.  Defendant sat at his desk at the JPMorgan Chase bank branch he was assigned to and was introduced to hundreds of existing bank clients (with or without investment accounts) so he could offer them, and provide access to, investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.  The vast majority of the clients Defendant serviced at JPMorgan were assigned to him by JPMorgan or were referred to him by JPMorgan Chase.

36.    JPMorgan has invested substantial time and money, totaling tens of millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, and the bearing of significant risk, that JPMorgan was able to acquire and retain its existing clients.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm. JPMorgan clients typically remain with and continue to be serviced by the firm for many years, often lasting over successive generations, regardless of whether the Private Client Advisor or other team members servicing the clients resign or otherwise leave JPMorgan.  But for Defendant's employment with JPMorgan, he would not have had any contact with nearly all the

clients the firm assigned to him and whom he is now soliciting, in violation of his contractual obligations.

37.    As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's assets and investment, banking and trust and estates needs, and financial goals.    Such information – which is not publicly available and cannot be easily duplicated – is proprietary and valuable, and it would be especially useful to a competitor.

### Defendant's Employment Agreements and Obligations to JPMorgan

38.    As noted above, Defendant entered into at least two agreements with JPMorgan or its predecessors during his employment that contain non-solicitation and confidentiality provisions.

39.    Section 7(a) of the 2013 Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

40.    Section 7(b) of the 2013 Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i. *names, addresses and telephone numbers of customers and prospective customers;*

ii.  *account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

iii.  *specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*       \*       \*

vi.  *all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*       \*       \*

viii.  *information concerning established business relationships;*

ix.  *"trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section*

41.    In Section 7(c) of the 2013 Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

42.    In Sections 7(d) and 7(e) of the 2013 Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

43.    In Section 8 of the 2013 Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets.  Accordingly, in consideration of and as a condition of your employment, continued*

*employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

b. *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Private Client and Chase Wealth Management Platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with CISC and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors.*

c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*

44.     Although Defendant had some prior industry experience before joining JPMorgan, on information and belief, he brought virtually no clients with him to JPMorgan. Self was permitted to identify all client relationships that he had established prior to commencing

employment with JPMorgan, and those pre-existing relationships would be carved out from his non-solicitation restrictions. "Attachment A" to the 2012 Non-Solicitation Agreement – the space specifically designated for listing any pre-existing relationships – lists only six clients/families.[4]

45.    In Section 10(a) of the 2013 Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.  *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*
>
> ii.  *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*
>
> iii.  *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

---

[4]    At the time of his resignation, only one family on his list was a client of JPMorgan, and none of the solicitations referred to herein relates to such family.

46.    In addition, in Section 10(b) of the 2013 Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

47.    In consideration for entering into an employment relationship with JPMorgan and entering into the agreements discussed above, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, underwriting, research, brokerage operations and health insurance.

### JPMorgan's Confidential Information

48.    During the course of his employment, Defendant was granted access to JPMorgan's client files containing confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with the vast majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan and was granted access to such information.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  This information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

49.    A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested untold sums in building JPMorgan's goodwill and brand awareness.  JPMorgan spends

substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

50.    JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  The substantial majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

51.    JPMorgan also has expended significant resources to service its clients, the substantial majority of whom were assigned to Defendant or referred to him by JPMorgan Chase.  These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

52.    JPMorgan employs reasonable efforts to maintain the confidentiality of its Confidential Information, including, but not limited to, its client records.  Specifically, access to

the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited, employees are required to use a secure password to access their computer terminals and the firm's intranet, and there are constant reminders about the confidential nature of the information contained on the records and the need to protect it. Employees are repeatedly made aware, and without question know, that they must maintain the strict confidentiality of the client information.

53.     The confidential information that Defendant has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third-parties or used for any third-parties' benefit.  Indeed, by law, JPMorgan must safeguard this information until such time as the controlling authorities or clients authorize its release.  Defendant had access to this information solely by virtue of his position with JPMorgan.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies, which reflect the legal responsibilities of the firm and its employees regarding confidentiality.  JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information.

54.     Employees such as Defendant must maintain client information as strictly confidential.

### Defendant's Misconduct

55.     As noted above, Defendant abruptly resigned from JPMorgan on January 6, 2023 and immediately joined Maia.  After joining Maia, Defendant has engaged in misconduct, including prohibited solicitation of JPMorgan clients and retention/use of confidential client information.

56.     In addition to the misconduct described above, a review of Defendant's computer activity leading up to his departure demonstrates that Defendant improperly accessed JPMorgan's Confidential Information concerning JPMorgan's clients.

57.     In the two weeks prior to his departure, Defendant accessed more than 75 client files on JPMorgan's system.  On information and belief, there was no legitimate business reason for him to access and view such a large volume of client information during the two weeks before he resigned.  Defendant accessed these confidential files for the purpose of reviewing and recording certain information – or, as he reportedly told one client, to take "snapshots" – for use in his solicitation efforts.

58.     The number of client files, and the times at which he viewed them, changed significantly during November 2022 and December 2022 – ***when numerous JPMorgan clients report having been told by Defendant that he was preparing to resign from JPMorgan***:

- In November and December 2022, Defendant viewed 215 and 252 accounts, respectively.  That is more than double the number of accounts Defendant viewed in ten of the prior sixteen months (i.e., July 2021 to October 2022); for example, in July 2022 Self viewed only 78 accounts, and in September 2022 he viewed only 41 accounts;

- On November 27, 2022 – the Sunday after Thanksgiving – Defendant viewed 60 accounts between 4:34 p.m. and 11:00 p.m.;

- On December 11, 2022, a Sunday, Defendant viewed 28 accounts between 4:24 p.m. and 10:12 p.m.;

- On December 15, 2022, Defendant viewed 35 accounts between 8:29 p.m. and 11:47 p.m.;

- On December 21, 2022, Defendant viewed 27 accounts between 7:38 p.m. and 11:25 p.m.;

- On December 23, 2022 – the Friday before Christmas, Defendant viewed 43 client accounts between 11:00 a.m. and 4:57 p.m.;

- Between January 3, 2023 and January 5, 2023 – the three days before Defendant resigned – Defendant accessed the client accounts for seven of the most affluent clients he was assigned to service; and

- Between January 3, 2023 and January 5, 2023 – the three days before Defendant resigned – his assistant, Stamper, viewed 67 client accounts, including 50 on January 3, 2023.  On information and belief, Stamper accessed these client records at Defendant's direction and to aid Defendant with his solicitation of JPMorgan's clients.

59.    The screens Defendant was accessing contain highly-confidential client information, including, among other things, client names, home addresses, e-mail addresses, phone numbers, dates of birth, social security numbers, account numbers, account balances and specific investment holdings, all of which constitutes JPMorgan's Confidential Information.

60.    It is this information that Defendant used to pre-fill the account applications and account transfer forms he sent to JPMorgan's clients upon his resignation – including the numerous forms he sent on the day he resigned.  Defendant took this information with him from JPMorgan to Maia (whether by taking "screenshots" of the information, as one client reported was told by Defendant, or by some other means), and has used such information at Maia to solicit JPMorgan's clients.

61.    Defendant's solicitation of JPMorgan clients is ongoing and continuing.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients.

62.    Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, violation of the Indiana Uniform Trade Secrets Act, violation of the Defend Trade Secrets Act, and unfair competition.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

63.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a) Loss of JPMorgan clients and loss of clients' confidence;

(b) Injury to JPMorgan's reputation and goodwill in the Indiana market;

(c) Improper retention, use and disclosure of JPMorgan's Confidential Information, including client-related information;

(d) Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

64.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 62 hereof.

65.     Defendant breached his contract and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking and using JPMorgan's Confidential Information.   By soliciting JPMorgan's clients and using and disclosing JPMorgan's Confidential Information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

66.     As a direct and proximate result of Defendant's breach of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

67.    JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 65 hereof.

68.    As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

69.    Defendant's fiduciary duty required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information.  Defendant's fiduciary duty required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company.

70.    Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing prior to the time he resigned from JPMorgan and after he joined Maia.

71.    As a direct and proximate result of Defendant's breach of his fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**THIRD CAUSE OF ACTION**
**(Breach of Duty of Loyalty)**

72.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 70 hereof.

73.    By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan.  Defendant's duty

of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan. Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

74.    Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

75.    Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

76.    As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq.)

77.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 75 hereof.

78.    JPMorgan's trade secrets and confidential and proprietary information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information. JPMorgan expended substantial financial and human resources to develop such information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential

individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its trade secrets and confidential and proprietary information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.  Accordingly, JPMorgan's trade secrets and confidential and proprietary information constitutes trade secrets pursuant to the Defend Trade Secrets Act.

79.    JPMorgan's trade secrets are related to a service used in, or intended for use in, interstate or foreign commerce. Defendant misappropriated JPMorgan's trade secrets by utilizing the information to contact and solicit JPMorgan clients to transfer their assets and business to him at Maia.  Defendant has engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of its agreements and policies prohibiting such conduct.  Defendant engaged in this conduct despite the fact that he knew or had reason to know that his knowledge of JPMorgan's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

80.    As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FIFTH CAUSE OF ACTION
**(Violation of the Indiana Uniform Trade Secrets Act, Ind. Code Ann. §§ 24-2-3-1 *et seq*.)**

81.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 79 hereof.

82.     JPMorgan's trade secrets and confidential and proprietary information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop such information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its trade secrets and confidential and proprietary information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.  Accordingly, JPMorgan's trade secrets and confidential and proprietary information constitutes trade secrets pursuant to the Indiana Uniform Trade Secrets Act.

83.     Defendant misappropriated JPMorgan's trade secrets by utilizing the information to contact and solicit JPMorgan clients to transfer their assets and business to him at Maia. Defendant has engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of its agreements and policies prohibiting such conduct. Defendant engaged in this conduct despite the fact that he knew or had reason to know that his knowledge of JPMorgan's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

84.     As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Intentional and/or Negligent Interference with Actual and Prospective Economic Advantages)

85.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 83 hereof.

86.    JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

87.    JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

88.    JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with Maia.

89.    There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, breach of his fiduciary duty, and breach of his duty of loyalty.

90.    Defendant's conduct was willful and malicious.

91.    As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to

sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### SEVENTH CAUSE OF ACTION
**(Unfair Competition)**

92.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 90 hereof.

93.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

94.     As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award on JPMorgan's claim for permanent injunctive relief after a hearing on the merits, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Maia, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest), excluding only those clients he formally serviced as broker of record at his prior firms; and

> (b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary

information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.      Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.      Such other and further relief as the Court deems just and proper.

Dated:  January 30, 2023

                                Respectfully submitted,

                                TUOHY BAILEY & MOORE LLP


                                */s/ Christopher C. Hagenow*
                                CHRISTOPHER C. HAGENOW
                                Attorney No. 16730-49

TUOHY BAILEY & MOORE LLP
50 S. Meridian Street #700
Indianapolis, Indiana 46204
Telephone: (317) 638-2400

Counsel for Plaintiff
J.P. Morgan Securities LLC